**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THERESA R. MINUTELLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:12-cv-01240** |
| | ) | |
| **HARTFORD LIFE AND ACCIDENT** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

The instant action involves a plan administrator's termination of long-term disability

benefits previously paid to a plan participant over the course of ten years.  Before the Court for

disposition are the Defendant's MOTION FOR SUMMARY JUDGMENT (*ECF No. 18*), the

Defendant's Brief in Support of Motion for Summary Judgment (*ECF No. 19*), the Defendant's

Concise Statement of Material Facts (*ECF No. 20*), the Plaintiff's MOTION FOR SUMMARY

JUDGMENT (*ECF No. 23*), the Plaintiff's Brief in Support of Motion for Summary Judgment

(*ECF No. 22*), the Plaintiff's Concise Statement of Material Facts (*ECF No. 24*), the Defendant's

Response in Opposition to the Plaintiff's Motion for Summary Judgment (*ECF No. 27*), the

Defendant's Response to the Plaintiff's Concise Statement of Material Facts (*ECF No. 28*), and

the Plaintiff's Response to the Defendant's Motion for Summary Judgment (*ECF No. 32*).  For

the reasons that follow, the Defendant's Motion for Summary Judgment will be granted, and the

Plaintiff's Motion for Summary Judgment will be denied.

**I.      Background**

Plaintiff Theresa R. Minutello ("Minutello") was born on February 13, 1960.  ECF No.

17 at 1.  In 1979, at the age of nineteen, she started to work as an Assistant Manager for the

1

Holiday Inn.  ECF Nos. 24 & 28 at ¶ 1.  On December 22, 1986, Starwood Hotels & Resorts

Worldwide, Inc. ("Starwood"), hired Minutello to work as an Assistant Banquet Manager.  ECF

Nos. 20 & 32 at ¶ 1.

Defendant Hartford Life and Accident Insurance Company ("Hartford") administers a

Group Benefit Plan ("Plan") available to Starwood employees.  ECF No. 17-2.  The Plan

provides long-term disability benefits to eligible employees pursuant to the terms of Group

Insurance Policy GLT-673050 ("Policy").  *Id.* at 5.  The language of the Policy that define the

terms "disability" and "disabled" provides as follows:

> **Disability or Disabled** means that during the Elimination Period and for the next
> 18 months you are prevented by:
> 1.     accidental bodily injury;
> 2.     sickness;
> 3.     Mental Illness;
> 4.     Substance Abuse; or
> 5.     pregnancy,
>
> From performing one or more of the Essential Duties of Your Occupation, and as
> a result your Current Monthly Earnings are no more than 80% of your Pre-
> disability Earnings.
>
> After that, you must be so prevented from performing one or more of the
> Essential Duties of Any Occupation.
>
> Your failure to pass a physical examination required to maintain a license to
> perform the duties of Your Occupation does not alone mean that you are
> Disabled.

*Id.* at 25.  The term "Your Occupation" is defined as a particular individual's "occupation as it is

recognized in the general workplace," and "does not mean the specific job [that he or she is]

performing for a specific employer or at a specific location."  *Id.* at 28.  The Policy defines the

term "Any Occupation" as "an occupation for which [an individual is] qualified by education,

training or experience," and that has an "earnings potential" exceeding an amount calculated in

accordance with specified terms. *Id.* at 24. Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." *Id.* at 17. As an employee of Starwood, Minutello participated in the Plan. ECF Nos. 20 & 32 at ¶ 2.

In June 2001, Minutello was examined by her family physician, Dr. Gurmit Singh, and her rheumatologist, Dr. Angela M. Stupi. ECF Nos. 20 & 32 at ¶ 7. She complained of fatigue, joint pain, myalgia, night sweats, exhaustion, and fevers. *Id.* Dr. Singh determined that Minutello was suffering from Mixed Connective Tissue Disease, Systematic Lupus Erythematosis ("SLE"), and Raynaud's Disease. *Id.* Minutello applied for long-term disability benefits on December 18, 2001, contending that she was "disabled" within the meaning of the Policy. *Id.* at ¶ 9. Her application was supported by a statement provided by Dr. Singh. *Id.*

Hartford approved Minutello's application for benefits. ECF Nos. 20 & 32 at ¶ 10. Maryann Iannettone ("Iannettone"), an Examiner for Hartford, communicated the approval to Minutello in a letter dated February 1, 2002. ECF No. 17-1 at 862-863. Although Minutello was deemed to be disabled because of her inability to perform the essential duties of her own occupation, Iannettone's letter explained that the more demanding "Any Occupation" standard would apply as of June 2, 2003. *Id.* at 863. Minutello was informed that, regardless of her condition, no benefits would be payable beyond February 12, 2027. *Id.* The amount of her monthly payment was set at $2,400.76. *Id.* at 864.

A participant seeking benefits under the Plan must apply for benefits under the Social Security Act [42 U.S.C. §§ 401-433, 1381-1383f] when the duration of his or her disability

"meets the minimum duration required to apply for such benefits."[1]  ECF No. 17-2 at 16.

Minutello was instructed to apply for Social Security disability benefits if she had not already

done so.  ECF No. 17-1 at 863.  In a decision rendered on February 17, 2002, the Social Security

Administration ("SSA") determined that Minutello had become statutorily "disabled" on June 1,

2001.  *Id.* at 1093.  She was advised that benefits under the Social Security Act would be

forthcoming.  *Id.*

After investigating Minutello's condition further, Hartford determined that she was

"disabled" under the "Any Occupation" standard.  ECF Nos. 20 & 32 at ¶ 12.  Consequently,

Minutello's benefits under the Plan continued beyond June 2, 2003.  ECF No. 17-1 at 1061.  On

June 7, 2005, Minutello verified that nobody in her family had an alternative source of income or

an interest in a business.  *Id.* at 42.  Between 2007 and 2009, Dr. Singh submitted annual

statements to Hartford supporting Minutello's continued eligibility for benefits.  ECF Nos. 20 &

32 at ¶ 14.  Minutello periodically detailed her abilities and limitations in response to inquiries

made by Hartford.  *Id.* at ¶ 15.

At some point, Minutello complained of progressive memory problems.  ECF Nos. 20 &

32 at ¶ 17.  On October 21, 2009, Dr. Hassan Hassouri performed a neurological examination of

Minutello to determine whether she was suffering from a memory impairment.  *Id.* at ¶ 16.  He

recommended that neuropsychometric testing be conducted to ascertain any deficits that she may

have had in specific areas.  *Id.*  An outpatient neuropsychological assessment was performed by

Dr. Tad Gorske on March 2, 2010.  *Id.* at ¶ 17.  In most respects, the assessment yielded normal

results.  *Id.* at ¶ 18.  Although Minutello's cognitive scores were consistent with those of patients

suffering from autoimmune disorders, Dr. Gorske suggested that such cognitive difficulties were

---

[1] A claimant attempting to secure Social Security disability benefits must satisfy the Social Security Act's twelve-month durational requirement.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

attributable to anxiety and depression.  *Id.* at ¶ 19.  A magnetic resonance imaging ("MRI") scan was recommended to rule out intracranial pathology.  *Id.* at ¶ 20.  Dr. Gorske also advised Minutello to "seek out a course of psychotherapy to work on stress management."  *Id.*  Minutello apparently declined to follow Dr. Gorske's recommendations.  *Id.*

A participant's payments under the Plan must be decreased by any amounts received under the Social Security Act.  ECF No. 17-2 at 10, 26.  Minutello contacted Hartford personnel on March 17, 2010, to advise that her daughter, Jacqueline Minutello ("Jacqueline"), had reached the age of eighteen and would soon graduate from high school.  ECF No. 17-1 at 43; ECF Nos. 24 & 28 at ¶ 11.  These developments evidently decreased the amount of Minutello's payments from the SSA, requiring Hartford to increase the amount of her long-term disability benefits under the Plan.  *Id.*  On May 18, 2010, the SSA sent Hartford a fax confirming the change in Minutello's benefits under the Social Security Act.  ECF No. 17-1 at 43.

Minutello's file was referred to Hartford's Special Investigations Unit ("SIU") on May 27, 2010.  ECF Nos. 24 & 28 at ¶ 13.  Hartford's documentary record of the referral reads as follows:

> Siu Referral: Clmt adv HIG on 6/7/2005 that her and her family do not have any income or interest in any business.  Internet research shows that clmt's spouse possibly owns Minutello's Restaurant and Lounge.  This is possibly the restaurant/lounge that clmt worked at prior to her employment w policy holder.  All APS in file are exactly the same.  When prior examier's called to speak to clmt . . . clmt is very hard to reach.  mj

ECF No. 17-1 at 42.  The notation was recorded by Maurice R. Jones ("Jones"), who worked as an Examiner for Hartford.  *Id.*  Further internet research apparently led Hartford's investigators to believe that Minutello was a shareholder of Allou Services Corporation, which operated out of the same location as the restaurant mentioned in Jones' notation.  ECF Nos. 20 & 32 at ¶ 22.

Hartford's suspicions were increased by the fact that Minutello was difficult to reach at home. *Id.* at ¶ 23.

Minutello was placed under video surveillance during the summer of 2010. ECF Nos. 20 & 32 at ¶¶ 25-32. Videotaped footage taken on June 9, 2010, and July 20, 2010, depicted Minutello walking without assistance, shopping on her own, and carrying bags of groceries. *Id.* at ¶¶ 26, 29-31. Additional footage taken on July 19, 2010, depicted Minutello and her daughter lifting a large desk from a van and carrying it into their garage. *Id.* at ¶ 28. Minutello was shown engaging in these activities in a free and agile manner. *Id.* at ¶ 32.

James M. Fitzgerald ("Fitzgerald"), a Hartford representative, interviewed Minutello in her home on November 29, 2010. ECF No. 17 at 47-67. Although Minutello confirmed that her husband owned Minutello's Restaurant and Lounge, she asserted that she did not work there. *Id.* at 53. During the interview, Minutello stated that she suffered from substantial exhaustion, and that she was typically forced to spend two or three days per week in bed. ECF Nos. 20 & 32 at ¶ 35. Minutello also complained of cognitive impairments. *Id.* She told Fitzgerald that, on a good day, she could engage in a wide range of activities for short periods of time. *Id.* at ¶ 36. Minutello acknowledged that she could sometimes drive or shop for up to two hours. *Id.* at ¶ 37. After listening to Minutello's description of her daily activities, Fitzgerald informed her of the surveillance videos and showed her the relevant recordings. *Id.* at ¶ 38. While watching the surveillance videos, Minutello suggested that they accurately reflected her average level of functionality. *Id.* The interview lasted for almost four hours. *Id.* at ¶ 39. Fitzgerald observed that Minutello had completed the interview without displaying signs of physical discomfort, and that she had articulated her answers to his questions without difficulty. *Id.* He summarized his findings in a written report. ECF No. 17 at 47-67.

Registered nurse Connie Behrle ("Behrle"), a Medical Case Manager for Hartford, sought Dr. Singh's updated assessment of Minutello's abilities and limitations. ECF No. 17-1 at 132-134. The request was communicated to Dr. Singh in a letter dated March 24, 2011. *Id.* Enclosed with Behrle's letter were duplicates of the surveillance videos and a copy of Fitzgerald's written report. *Id.* at 132. Dr. Singh was asked to review the additional evidence provided by Hartford before rendering an opinion as to whether Minutello could perform the duties of a full-time job. *Id.* at 132-134. Hartford never received a response from Dr. Singh. ECF Nos. 20 & 32 at ¶ 41.

Under the terms of the Plan, a participant receiving benefits can be asked to submit to a medical examination. ECF No. 17-2 at 7. A participant's refusal to undergo such an examination can result in the termination of his or her benefits. *Id.* at 9. Hartford asked Minutello to undergo an independent medical examination for the purpose of determining whether she could work. ECF No. 17-1 at 418. The examination was performed by Dr. Lloyd K. Richless on May 31, 2011. ECF Nos. 20 & 32 at ¶ 42. Minutello told Dr. Richless that she could do "anything" on a good day, but that she could not even get out of bed on a bad day. ECF No. 17-1 at 411-412. The examination yielded no outward manifestations of physical abnormalities. ECF Nos. 20 & 32 at ¶ 44. After completing the examination, Dr. Richless opined that Minutello's impairments would not prevent her from maintaining a full-time job. ECF No. 17-1 at 415. In a written report describing his examination findings, Dr. Richless stated that Minutello could "perform all functions of a 51-year-old female without accommodation." *Id.* He reported that if Minutello were to be employed on a full-time basis, her fatigue would necessitate no more than one or two absences every two to three months. *Id.* Dr. Richless'

assessment was based on the findings of his examination and the depictions of Minutello in the surveillance videos. ECF Nos. 20 & 32 at ¶ 49.

Registered nurse Johanna Cobb ("Cobb"), the Medical Case Manager assigned to Minutello's case, forwarded the results of the independent medical examination to Dr. Singh on June 9, 2011. ECF No. 17-1 at 126. Dr. Singh was asked to review Dr. Richless' findings and provide feedback. *Id.* Someone from Dr. Singh's office contacted Hartford personnel on June 16, 2011, and expressed concerns about Dr. Richless' "credentials" and "conclusion." ECF No. 17 at 78. Although Dr. Singh was encouraged to articulate his concerns in a more detailed manner, he never did so. ECF Nos. 20 & 32 at ¶ 51. Marvin Bryant ("Bryant"), a Vocational Rehabilitation Counselor, assessed Minutello's employment prospects in a written report dated July 14, 2011. ECF No. 17-1 at 383-396. After reviewing evidence of Minutello's medical and vocational background, Bryant expressed the view that she could work as either a manager of a liquor establishment or a reservations manager for a hotel or restaurant. *Id.* at 384.

Based on the results of Dr. Richless' examination and Bryant's vocational assessment, Hartford decided to terminate Minutello's long-term disability benefits. ECF Nos. 20 & 32 at ¶ 54. Investigative analyst Jonathan Dennis ("Dennis") communicated Hartford's decision to Minutello in a letter dated July 26, 2011. ECF No. 17-1 at 118-124. The letter advised that her long-term disability benefits would not continue beyond July 25, 2011. *Id.* at 122. The Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. § 1001 *et seq.*] requires a letter denying a participant's claim for benefits to "set[] forth the specific reasons for such denial . . . in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). Dennis' letter explained that the termination of Minutello's benefits had been prompted by the content of the surveillance videos, the results of Fitzgerald's interview, the findings of Dr.

Richless' examination, and Bryant's vocational assessment.  ECF No. 17-1 at 118-124.  It was specifically noted that Dr. Singh had not responded to Hartford's inquiries.  *Id.* at 121-122.  The ERISA requires every covered employee benefit plan to provide "any participant whose claim for benefits has been denied" with "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).  Minutello was informed that she could appeal the decision terminating her benefits by writing a letter to Hartford's Claim Appeal Unit within 180 days.  *Id.* at 123.  Dennis notified Starwood of Hartford's decision to discontinue Minutello's benefits.  *Id.* at 125.

A regulation promulgated pursuant to the ERISA requires any letter denying a participant's request for benefits to include "[a] statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."  29 C.F.R. § 2560.503-1(j)(3).  Dennis' letter to Minutello contained the required statement.  ECF No. 17-1 at 123.  On August 24, 2011, Minutello's attorney sent the Claim Appeal Unit a written request for all pertinent documents.  ECF No. 17-1 at 376-377.  Copies of the documents were apparently furnished to Minutello.  Through her counsel, Minutello appealed Hartford's decision in a letter to the Claim Appeal United dated October 19, 2011.  *Id.* at 294-296.  Enclosed with the letter was an updated assessment form completed by Dr. Singh on September 30, 2011.  *Id.* at 297-302.  On the form, Dr. Singh reported that Minutello could sit, stand or walk for only ten minutes at a time, equaling less than two hours of an eight-hour workday.  *Id.* at 299-300.  He further opined that she could never lift or carry objects weighing ten pounds or more, that she could rarely twist or stoop, and that she needed to avoid all exposure to cold and hot temperatures, high humidity, sunlight, and

ultraviolet light.  *Id.* at 300-301.  Dr. Singh predicted that Minutello would need to miss more than four days of work per month if she were to be employed on a full-time basis.  *Id.* at 301.

In order to resolve the appeal, Hartford asked Minutello to undergo a functional capacity evaluation.  ECF Nos. 20 & 32 at ¶ 66.  The evaluation was performed by Mark A. Aaron ("Aaron"), a physical therapist, on December 13, 2011.  *Id.* at ¶ 67.  After completing the evaluation, Aaron opined that Minutello was physically capable of performing "light" work on a full-time basis.  *Id.*  The Dictionary of Occupational Titles ("DOT") places a job in the "light" category if it requires one to frequently lift or carry objects weighing up to ten pounds and occasionally lift or carry objects weighing up to twenty pounds.  *Id.*  The jobs identified in Bryant's report were classified as "light" positions.  ECF No. 17-1 at 389, 394.  Aaron reported that Minutello had "self-limited" on 50% of the twenty tasks that she had been asked to perform.  *Id.* at 252.  Under the scale used during the evaluation, Minutello's level of self-limiting behavior was significantly in excess of normal limits.  *Id.*; ECF Nos. 20 & 32 at ¶ 69.

Hartford ultimately decided to uphold its earlier decision terminating Minutello's long-term disability benefits.  ECF Nos. 20 & 32 at ¶ 70.  Genie M. Guthrie ("Guthrie"), an Appeal Specialist for Hartford, informed Minutello's counsel of the decision in a letter dated December 20, 2011.  ECF No. 17-1 at 107-110.  Guthrie's letter advised that the "appeal decision" was "final," that Minutello's claim file was being closed, and that "no further review" of the matter would be conducted by Hartford.  *Id.* at 110.  Minutello was provided with notice of her right to challenge the termination decision in a civil action brought under the ERISA.  *Id.*

Minutello commenced this action against Hartford and Starwood on August 28, 2012, alleging that they had violated the ERISA by terminating her long-term disability benefits.  ECF No. 1.  One month later, the parties stipulated to Starwood's dismissal from the case.  ECF Nos.

6 & 7. The caption was amended to reflect Hartford's status as the only remaining defendant. ECF No. 7 at 1. Hartford moved for summary judgment on February 21, 2013. ECF No. 18. Minutello filed her motion for summary judgment the next day. ECF No. 23. The parties' cross-motions for summary judgment are the subject of this memorandum opinion.

## II.     Jurisdiction and Venue

The instant action arises under the ERISA. The Court has subject-matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), (f). Venue is proper under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2).

## III.    Discussion

Employee benefit plans are regulated by the ERISA's "comprehensive and complex scheme." *Estate of Kensinger v. URL Pharma, Inc.*, 674 F.3d 131, 135 (3d Cir. 2012). Since the Plan at issue in this case provides participants with "benefits in the event of . . . disability," it qualifies as an "employee benefit plan" governed by the ERISA. 29 U.S.C. § 1002(1), (3). Although the ERISA neither "requires employers to establish employee benefits plans" nor specifies the benefits available under such plans, it does "seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). In enacting the ERISA, Congress created "a scheme that is built around reliance on the face of written plan documents." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). In order to protect the legitimate expectations of plan participants, the relevant statutory language provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). A fiduciary charged with the duty of administering a plan must act "in accordance with the documents and instruments governing the

plan," provided that such "documents and instruments" are consistent with the applicable statutory requirements. 29 U.S.C. § 1104(a)(1)(D); *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 555 U.S. 285, 288, 129 S.Ct. 865, 172 L.Ed.2d 662 (2009).

Section 502(a)(1)(B) of the ERISA, which is codified at 29 U.S.C. § 1132(a)(1)(B), permits a "participant" like Minutello "to recover benefits due to h[er] under the terms of h[er] plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan." Since Minutello seeks "to recover benefits due to h[er]" under the Plan, and to "enforce" and "clarify h[er] rights to future benefits" thereunder, her claim against Hartford arises under § 1132(a)(1)(B). *Eichorn v. AT&T Corp.*, 484 F.3d 644, 651-653 (3d Cir. 2007). The ERISA provides that "[a]n employee benefit plan may sue or be sued . . . as an entity." 29 U.S.C. § 1132(d)(1). Minutello has sued Hartford, which administers the Plan, rather than the Plan itself. ECF No. 1 at ¶ 4. Her claim against Hartford is based solely on her alleged entitlement to long-term disability benefits. *Id.* at ¶¶ 11-17. The complaint does not allege that Hartford has breached a distinct fiduciary duty. Therefore, Minutello can proceed with her ERISA claim against Hartford only in its official capacity as the Plan administrator.[2] *Graden v. Conexant Systems, Inc.*, 496 F.3d 291, 301 (3d Cir. 2007). She cannot seek a "money judgment" against Hartford in its "individual capacity." 29 U.S.C. § 1132(d)(2). Instead, she can only request an order directing Hartford to provide her with benefits from the Plan assets. *Hahnemann University Hospital v. All Shore, Inc.*, 514 F.3d 300, 308 (3d Cir. 2008).

A.    **The Standard of Review**

The ERISA contains no specific language establishing a standard of review for claims arising under § 1132(a)(1)(B). *Haisley v. Sedgwick Claims Management Services, Inc.*, 776

---

[2] Hartford qualifies as the Plan "administrator" by virtue of its status as the "plan sponsor." 29 U.S.C. § 1002(16)(A)(ii).

F.Supp.2d 33, 42 (W.D.Pa. 2011). Invoking principles of trust law, the United States Supreme

Court explained in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103

L.Ed.2d 80 (1989), that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed

under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

Although the rule established in *Firestone* defaults to *de novo* review when the terms of the plan

are silent, it calls for "a deferential standard of review" when "a trustee exercises discretionary

powers." *Firestone*, 489 U.S. at 111. Where such discretionary powers are exercised, "an

employer can rely on the expertise of the plan administrator rather than worry about unexpected

and inaccurate plan interpretations that might result from *de novo* judicial review." *Conkright v.*

*Frommert*, 559 U.S. 506, ___, 130 S.Ct. 1640, 1649, 176 L.Ed.2d 469 (2010).

Hartford bears the burden of establishing the applicability of a deferential standard of

review. *Viera v. Life Insurance Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011). The

proper standard of review must be ascertained from the terms of the Plan. *Luby v. Teamsters*

*Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991). The applicable

policy language clearly provides Hartford with "full discretion and authority to determine

eligibility for benefits and to construe and interpret all terms and provisions of the Group

Insurance Policy." ECF No. 17-2 at 17. This language must be construed in accordance with

"[o]rdinary principles of contract interpretation." *US Airways, Inc. v. McCutchen*, 569 U.S. ___,

___, 133 S.Ct. 1537, 1548-1549, 185 L.Ed.2d 654 (2013). Since the policy language

unambiguously gives Hartford the "authority to determine [Minutello's] eligibility for benefits,"

its factual findings pertaining to her medical condition must be accorded deference. *Heasley v.*

*Belden & Blake Corp.*, 2 F.3d 1249, 1256 (3d Cir. 1993).

"The 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard." *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45, n. 4 (3d Cir. 1993). This standard controls the Court's review of Hartford's decision to terminate Minutello's long-term disability benefits. *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526, n. 2 (3d Cir. 2009). The dispositive question is whether that decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Adamo v. Anchor Hocking Corp.*, 720 F.Supp. 491, 500 (W.D.Pa. 1989).

### B. Hartford's Conflict of Interest

"[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (brackets in original), quoting the RESTATEMENT (SECOND) OF TRUSTS § 187, Comment d (1959). In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), the Supreme Court recognized that a "conflict of interest" exists when "a plan administrator both evaluates claims for benefits and pays benefits claims." Although this factor (like any other factor) may "act as a tiebreaker when the other factors are closely balanced," it is of minimal importance when the administrator has taken steps to reduce bias and promote accuracy "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117. For this reason, the degree to which a conflict of interest may be relied upon to impugn a denial of benefits often depends on the precise nature of the funding arrangement in question. *Post v. Hartford Insurance Co.*, 501 F.3d 154, 162-164 (3d Cir. 2007).

Hartford implicitly acknowledges that it operates under a conflict of interest of the kind identified in *Glenn*. ECF No. 27 at 3-5. The particular funding arrangement utilized by Hartford cannot be gleaned from the record. Where a deferential standard applies, a reviewing court may ordinarily consider only the evidence that was before the plan administrator at the time of the challenged decision. *Sivalingam v. Unum Provident Corp.*, 735 F.Supp.2d 189, 194-195 (E.D.Pa. 2010). This general rule, however, does not preclude the parties from supplementing the record with evidence relating to a particular plan's "actual funding mechanism." *Kosiba v. Merck & Co.*, 384 F.3d 58, 67, n. 5 (3d Cir. 2004). Although the parties were free to introduce extrinsic evidence pertaining to the precise nature of Hartford's conflict of interest, they did not do so.

Denying that bias infected its decision to discontinue Minutello's long-term disability benefits, Hartford points out that other courts have found its funding arrangement and review procedures to be fair and impartial. ECF No. 27 at 3-5. The problem with Hartford's position is that the organization of its funding arrangement presents a question of *adjudicative* fact rather than a question of *legislative* fact. Federal Rule of Evidence 201, which governs a federal court's ability to take "judicial notice" of facts extrinsic to the record, applies only to adjudicative facts. FED. R. EVID. 201(a). A court is free to look beyond the evidentiary record developed in a particular case in order to uncover legislative facts. *Daggett v. Commission on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999)(remarking that "the ordinary limits on judicial notice hav[e] no application to legislative facts"); *O'Hanlon v. Hartford Accident & Indemnity Co.*, 457 F.Supp. 961, 962 (D.Del. 1978)(observing that legislative facts "are not normally developed through the presentation of evidence"). For example, a statute or ordinance challenged on constitutional grounds can sometimes be upheld

on the basis of evidence presented in cases involving challenges to similar statutes or ordinances. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d (2001); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628-629, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Unlike legislative facts, which "relate to the content of the law itself," adjudicative facts "concern the particular parties before the Court." *Project Vote v. Kelly*, 805 F.Supp.2d 152, 184 (W.D.Pa. 2011). The factual circumstances surrounding Hartford's conflict of interest clearly fall into the latter category. Hartford does not assert that its funding arrangement "is generally known within [this Court's] territorial jurisdiction," or that it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[3] FED. R. EVID. 201(b)(1)-(2). Since the criteria applicable under Rule 201 are not satisfied, the precise nature of Hartford's conflict of interest cannot be determined by reference to the evidentiary records established in other cases.

Minutello contacted Hartford on March 17, 2010, to advise that Jacqueline had reached the age of eighteen. ECF No. 17-1 at 43. The resulting change in Minutello's Social Security disability benefits was confirmed by the SSA on May 18, 2010. *Id.* According to Minutello, this change required Hartford to pay her an additional $872.00 per month. ECF No. 22 at 13-14. Her claim file was referred to Hartford's SIU on May 27, 2010. ECF No. 17-1 at 42. Minutello argues that the temporal proximity between the change in her monthly entitlement and the commencement of the investigation suggests that Hartford acted to terminate her long-term disability benefits on the basis of its own financial interests. ECF No. 32 at 6-7. She urges the

---

[3] Hartford strenuously objects to a request by Minutello that judicial notice be taken of the definition of "lupus" found on a website maintained by the Lupus Foundation of America. ECF No. 27 at 7-8. The Court understands Hartford's position to be that Rule 201 should not be utilized in this case. *Id.* at 8.

Court to consider this "conflict of interest" in determining whether Hartford's actions were reasonable. *Id.*

The timing of the investigation gives rise to an inference that it was triggered by the information provided to Hartford by Minutello and the SSA. *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 307 (3d Cir. 2012). The relevant question, however, is whether that information "affected the decision to deny benefits." *Howley v. Mellon Financial Corp.*, 625 F.3d 788, 794 (3d Cir. 2010). Minutello cannot prevail in this action simply by showing that Hartford acted arbitrarily or capriciously in taking some discrete action independent of the termination decision itself. *Judge v. Metropolitan Life Insurance Co.*, 710 F.3d 651, 660 (6th Cir. 2013). While the Court must account for any "structural conflict of interest" demonstrated by the record, the ultimate disposition of the case still turns on "whether a reasonable basis existed for the administrator's benefits decision." *Blankenship v. Metropolitan Life Insurance Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). In this vein, the inquiry focuses on the *decision* to terminate Minutello's benefits rather than on the pre-termination *investigation*. *Funk v. CIGNA Group Insurance*, 648 F.3d 182, 191, n. 11 (3d Cir. 2011).

Although Minutello has not supplemented the record with evidence illustrating the *degree* to which Hartford's conflict of interest should be factored into the analysis, the mere *existence* of that conflict weighs in her favor. *Glenn*, 554 U.S. at 115-118. Under the present circumstances, however, it is not a "determinative factor." *Fleisher v. Standard Insurance Co.*, 679 F.3d 116, 122, n. 3 (3d Cir. 2012). Since Hartford's factual findings are clearly "reasonable," they cannot be disturbed. *Conkright*, 130 S.Ct. at 1651. This remains the case even if it is assumed that Hartford took no affirmative steps to reduce any potential bias resulting from its own financial interests. *Glenn*, 554 U.S. at 117.

## C.       Hartford's Weighing of the Evidence

The crux of Minutello's argument is that Hartford abused its discretion in deciding to credit the opinion of Dr. Richless over that of Dr. Singh.  ECF No. 22 at 6-8.  In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), the Supreme Court held that "plan administrators are not obliged to accord special deference to the opinions of treating physicians."  In the present context, the relevant question is whether Hartford "arbitrarily" refused to credit "reliable evidence" submitted by Minutello, including the assessment provided by Dr. Singh.  *Nord*, 538 U.S. at 834.

On November 29, 2010, Fitzgerald interviewed Minutello in her home.  ECF No. 17 at 47-67.  During her encounter with Fitzgerald, Minutello stated that she could lift or carry objects weighing up to twenty pounds.  *Id.* at 49.  She also acknowledged that she could drive or sit for a maximum of two hours at a time.  *Id.* at 51.  In Fitzgerald's presence, Minutello viewed the surveillance videos that had been created by the SIU.  ECF Nos. 20 & 32 at ¶ 38.  She later signed a statement characterizing the depictions of her in those videos as accurate representations of her "average level of functionality."  ECF No. 17 at 55.

Behrle contacted Dr. Singh on March 24, 2011, and asked him to assess Minutello's work-related abilities and limitations.  ECF No. 17-1 at 132-134.  Dr. Singh was provided with copies of the surveillance videos and the written report prepared by Fitzgerald.  *Id.* at 132.  Behrle's letter instructed Dr. Singh to consider the "additional information" supplied by Hartford "in conjunction with [his] medical findings."  *Id.*  Dr. Singh did not respond to Hartford's request for information about Minutello's condition.  ECF Nos. 20 & 32 at ¶ 41.  The documentary record suggests that Hartford may have referred Minutello for an independent medical examination *because* Dr. Singh had not responded to Behrle's inquiry.  ECF No. 17-1 at 25-26.

Dr. Richless examined Minutello on May 31, 2011. ECF No. 17-1 at 410-417. He found her work-related abilities to be unrestricted. *Id.* at 415-416. In a written report, Dr. Richless summarized his examination findings by stating as follows:

> Ms. Minutello is a 51-year-old female with mild SLE (lupus) and possible mild mixed connective tissue disorder who is able to work without accommodations in a 40-hour capacity at any job that would meet her educational level and average physical abilities for a 51-year-old female. There are no specific limitations on lifting, twisting, bending, or climbing. She may stand, walk, and sit unrestricted. She would have no difficulty operating controls.

*Id.* at 416. Hartford paid Dr. Richless $1,085.00 to perform the examination. *Id.* at 419.

The examination report prepared by Dr. Richless was forwarded to Dr. Singh. ECF No. 17-1 at 126. On June 16, 2011, someone from Dr. Singh's office contacted Hartford and expressed doubts about Dr. Richless' "credentials" and the reliability of his findings. ECF No. 17 at 78. Cobb invited Dr. Singh to explain why he disagreed with Dr. Richless. *Id.* Dr. Singh never responded to Cobb's inquiry. ECF Nos. 20 & 32 at ¶ 51. Hartford decided to terminate Minutello's long-term disability benefits shortly after the completion of Bryant's vocational assessment. *Id.* at ¶¶ 52-54.

In a letter dated July 26, 2011, Dennis informed Minutello that her benefits were being terminated. ECF No. 17-1 at 118-124. In the portion of the letter articulating Hartford's weighing of the medical evidence, Dennis stated as follows:

> Our Medical Case Manager (MCM) reviewed your entire claim file on 02/01/11 and sent a letter along with copies of the surveillance documentation, videos, and interview statements to Dr. Singh for review. Dr. Singh was asked to comment on your maximum level of functionality. However, as of 05/09/11, Dr. Singh had not responded to the request.
>
> In order to give your claim every consideration, the MCM involved the services of an independent medical consultant and scheduled an Independent Medical Evaluation (IME) to be conducted on 05/31/11. The evaluation was performed by Dr. Lloyd Richless, Family Practice. You attended the evaluation as scheduled.

As a part of his evaluation, Dr. Richless contacted Dr. Singh's office on 06/01/11 to obtain additional medical information. In his report, Dr. Richless stated that based upon the physical examination findings, the history, diagnostic studies, and all consultant reports, you do not have any significant physical limitations and can perform all functions of a 51-year-old female without accommodation. He stated that you may stand, walk, and sit unrestricted and that you would have no difficulty operating controls. Dr. Richless concluded that you would be able to work without accommodations in a 40 hour capacity at any job that would meet your educational level and average physical abilities for a 51 year-old female.

On 06/09/11, our Medical Case Manager sent a copy of Dr. Richless's report to Dr. Singh and asked that he comment within 15 days. On 06/16/11, Dr. Singh's office contacted the MCM and advised that Dr. Singh was concerned with the credentials of Dr. Richless and the conclusion of his evaluation. Dr. Singh was encouraged to express his concerns in his response. As of 06/30/11, Dr. Singh had not provided a response.

In reviewing your claim, The [sic] Hartford considered your claim file as a whole for the purposes of determining your entitlement for plan benefits. Based on the response from Dr. Richless, as well as the investigative documentation obtained, the weight of the evidence in your file supports that you are physically capable of performing full-time work in a sedentary to light occupation.

*Id.* at 121-122. Dennis' letter further explained that, based on Bryant's vocational assessment, Minutello was deemed to be capable of working as a manager of a liquor establishment or a reservations manager for a hotel or restaurant. *Id.* at 122.

Dr. Singh reassessed Minutello's work-related abilities and limitations on September 30, 2011. ECF No. 17-1 at 298-302. He reported that Minutello could sit, stand or walk for less than two hours during the course of an eight-hour workday. *Id.* at 300. Dr. Singh indicated that Minutello could *continuously* sit or stand for no more than ten minutes at a time. *Id.* at 299. He further opined that she could *never* lift or carry objects weighing ten pounds or more, and that she could *rarely* lift or carry objects weighing less than ten pounds.[4] *Id.* at 300. Dr. Singh predicted that Minutello's impairments would necessitate more than four absences per month if

---

[4] Dr. Singh had previously reported that Minutello could occasionally lift or carry objects weighing up to (and including) ten pounds. ECF No. 17 at 20.

she were to be employed on a full-time basis. *Id.* at 301. The assessment form completed by Dr. Singh was sent to the Claim Appeal Unit. *Id.* at 294-297.

Hartford referred Minutello to Aaron for a functional capacity evaluation. ECF Nos. 20 & 32 at ¶ 66. The evaluation was performed on December 13, 2011. ECF No. 17-1 at 251. During the evaluation, Minutello "safely" lifted a 22-pound object from the floor to her waist and a 17-pound object from her waist to her eyes. *Id.* at 258-259. Aaron opined that Minutello was capable of performing "light" work, which requires one to occasionally lift or carry objects weighing up to twenty pounds and frequently lift or carry objects weighing up to ten pounds. *Id.* at 252. He went on to state that his opinion described Minutello's "minimum" abilities, and that her "self-limiting and inconsistent behavior" had made it impossible for him to determine her "maximum" abilities. *Id.* Hartford paid Aaron $1,100.00 for his services. *Id.* at 263.

After reviewing the results of Aaron's evaluation, Hartford decided to uphold its earlier decision terminating Minutello's long-term disability benefits. ECF Nos. 20 & 32 at ¶ 70. The decision was communicated to Minutello's counsel in a letter from Guthrie dated December 20, 2011. ECF No. 17-1 at 107-110. In her letter, Guthrie pointed out that the extreme lifting and carrying limitations identified by Dr. Singh were inconsistent with Minutello's earlier statements to Fitzgerald. *Id.* at 108. Relying on the findings of Dr. Gorske, Dr. Richless and Aaron, Guthrie stated that "Dr. Singh's reported limitations precluding work capacity d[id] not appear to be consistent with the documented examination findings and professional observations of other sources." *Id.* at 109. She further advised that Hartford's "appeal decision" was "final," and that Minutello would need to commence a civil action under the ERISA in order to seek further review. *Id.* at 110.

Minutello assails Hartford for discontinuing her long-term disability benefits after paying them for a decade. ECF No. 22 at 5-6. The termination of a plan participant's existing benefits in the absence of "new medical information" constitutes an "irregularity" that must be weighed against the plan administrator's decision. *Miller v. American Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. 2011). In this case, however, Hartford based its termination decision on new evidence of Minutello's condition. That evidence included the surveillance videos created by the SIU, Minutello's statements to Fitzgerald, Dr. Richless' examination findings, and the results of Aaron's functional capacity evaluation. ECF Nos. 20 & 32 at ¶¶ 25-39, 42-49, 66-69. Under these circumstances, no inference of impropriety can be drawn from the change in Hartford's position. Since the focus of the Court's inquiry is on Hartford's *final decision*, the fact that an increase in Minutello's monthly entitlement may have triggered the SIU's *investigation* into her condition is of no dispositive significance.[5] *Funk*, 648 F.3d at 191, n. 11.

Some federal courts have taken judicial notice of medical resources describing the characteristics of "lupus." *Wible v. Aetna Life Insurance Co.*, 375 F.Supp.2d 956, 965-966 (C.D.Cal. 2005); *Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F.Supp. 653, 657-658 (D.P.R. 1997). A website maintained by the Lupus Foundation of America defines "lupus" as follows:

> Lupus is a chronic, autoimmune disease that can damage any part of the body (skin, joints, and/or organs inside the body). Chronic means that the signs and symptoms tend to last longer than six weeks and often for many years. In lupus, something goes wrong with your immune system, which is the part of the body that fights off viruses, bacteria, and germs ("foreign invaders," like the flu). Normally our immune system produces proteins called antibodies that protect the body from these invaders. Autoimmune means your immune system cannot tell the difference between these foreign invaders and your body's healthy tissues

---

[5] A conflict of interest is relevant to the analysis only because an administrator's "fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). A recipient whose benefits are *properly* terminated as a result of an investigation motivated by financial considerations is not entitled to have his or her benefits reinstated. *Blankenship v. Metropolitan Life Insurance Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011)(explaining that a conflict of interest does not alter the "basic analysis," which centers on "whether a reasonable basis existed for the administrator's benefits decision").

("auto" means "self") and creates autoantibodies that attack and destroy healthy tissue. These autoantibodies cause inflammation, pain, and damage in various parts of the body.

www.lupus.org (as visited on August 1, 2013). Minutello asks the Court to take judicial notice

of this definition. ECF No. 22 at 8. Hartford objects to Minutello's request on the ground that

the Court has no way to verify the accuracy of statements posted on the website. ECF No. 27 at

7. Since the Court's review is limited to the information that was before Hartford at the time of

its decision, statements appearing on a private website are not relevant to the inquiry. *Cavert*

*Acquisition Co. v. NLRB*, 83 F.3d 598, 609-610 (3d Cir. 1996); *Gernes v. Health & Welfare Plan*

*of Metropolitan Cabinet*, 841 F.Supp.2d 502, 514 (D.Mass. 2012).

In any event, Hartford does not dispute Minutello's assertion that lupus can "cause

inflammation, pain, and damage in various parts of the body." Instead, Hartford simply contends

that Minutello's lupus is not disabling. ECF No. 27 at 10. An individual experiencing pain may

still be capable of engaging in "light" or "sedentary" work activities. *Welch v. Heckler*, 808 F.2d

264, 270 (3d Cir. 1986). "[E]ven if two different plaintiffs alleging substantial limitations suffer

from the same impairment, the nuances of its effect on their daily lives will invariably manifest

themselves in distinct ways." *Emory v. AstraZeneca Pharmaceuticals, LP*, 401 F.3d 174, 182

(3d Cir. 2005). The question in this case is whether Hartford abused its discretion in determining

that *Minutello's* lupus did not prevent *her* from maintaining a full-time job. Dr. Richless found

Minutello's lupus to be "mild." ECF No. 17-1 at 416. His examination uncovered no specific

work-related limitations. *Id.* at 415-416. After completing his functional capacity evaluation,

Aaron concluded that Minutello's impairments would not preclude her from performing the

duties of a "light" job. *Id.* at 251-261. Unlike the assessments provided by Dr. Richless and

Aaron, which relate to the precise issue before the Court, statements describing the painful effects of lupus in generic terms are of minimal probative value.

Hartford ultimately determined that the "limitations and restrictions" identified by Dr. Singh were not "consistent with the documented examination findings and professional observations of other sources." ECF No. 17-1 at 109. Minutello argues that the impact of her impairments cannot be measured solely by reference to objective evidence. ECF No. 22 at 8-14; ECF No. 32 at 9-13. In support of her position, she relies on *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997). ECF No. 22 at 10-11. In *Mitchell*, the United States Court of Appeals for the Third Circuit held that a plan administrator had abused its discretion in denying a claimant's application for benefits *solely* because he had failed to present "objective medical evidence" of chronic fatigue syndrome. *Mitchell*, 113 F.3d at 442-443. The decision in *Mitchell* was premised on the fact that "there [wa]s no 'dipstick' laboratory test" capable of detecting that particular impairment. *Id.* at 443, quoting *Sisco v. United States Dept. of Health & Human Services*, 10 F.3d 739, 744 (10th Cir. 1993).

The present circumstances are meaningfully different from those presented in *Mitchell*. Hartford did not terminate Minutello's benefits on the ground that she had failed to establish the existence of her lupus. The termination decision was based on evidence suggesting that Minutello could work despite the limitations resulting from that impairment. ECF No. 17-1 at 107-110. For this reason, the rule established in *Mitchell* is not implicated in this case. *Wernicki-Stevens v. Reliance Standard Life Insurance Co.*, 641 F.Supp.2d 418, 426-427 (E.D.Pa. 2009). Furthermore, the record in *Mitchell* contained "undisputed evidence" of the claimant's disability. *Mitchell*, 113 F.3d at 442. The evidence of Minutello's disability, which consists mostly of information provided by Dr. Singh, is contradicted by depictions of Minutello in the

SIU's surveillance videos, Fitzgerald's observations of Minutello's demeanor, Dr. Richless' examination findings, and the results of Aaron's functional capacity evaluation. ECF Nos. 20 & 32 at ¶¶ 25-39, 42-49, 66-69. Nothing in *Mitchell* undermines Hartford's decision to discontinue Minutello's benefits. *Wernicki-Stevens*, 641 F.Supp.2d at 426-427.

Minutello questions the propriety of Hartford's reliance on surveillance videos as a basis for terminating her benefits. ECF No. 22 at 14-18. As a general matter, "video surveillance remains a proper method of investigating disability insurance claims." *Eppley v. Provident Life & Accident Insurance Co.*, 789 F.Supp.2d 546, 573 (E.D.Pa. 2011). The probative value of videotaped depictions of a claimant's activities generally depends on what those depictions demonstrate in relation to the administrative record as a whole. *Id.* at 573-574. A plan administrator abuses its discretion when it terminates a claimant's benefits based on footage demonstrating his or her ability to engage in minimal activities for brief periods of time. *Migliaro v. IBM Long-Term Disability Plan*, 231 F.Supp.2d 1167, 1178 (M.D.Fla. 2002); *Dorsey v. Provident Life & Accident Insuruance Co.*, 167 F.Supp.2d 846, 856 (E.D.Pa. 2001); *Clausen v. Standard Insurance Co.*, 961 F.Supp. 1446, 1457 (D.Colo. 1997). An individual need not "vegetate in a dark room excluded from all forms of human and social activity" in order to qualify as "disabled." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). On the other hand, videotaped depictions of a claimant engaging in certain activities may be relied upon to refute a treating physician's assertion that the claimant is incapable of engaging in those activities. *Vlass v. Raytheon Employers Disability Trust*, 244 F.3d 27, 31-32 (1st Cir. 2001). When such depictions are accompanied by medical reports declaring a claimant fit for duty, they may justify a finding that he or she is not disabled. *McGarrah v. Hartford Life Insurance Co.*, 234 F.3d

1026, 1032 (8th Cir. 2000); *Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505-506 (7th Cir. 1995); *Osbun v. Auburn Foundry, Inc.*, 293 F.Supp.2d 863, 869-870 (N.D.Ind. 2003).

A videotape created by the SIU on July 19, 2010, shows Minutello and her daughter lifting a large desk from a van and carrying it into a garage. ECF No. 17 at 29. The footage captured on that videotape, which has been viewed by the Court, does not depict an individual who can *never* lift objects weighing more than ten pounds, or who can lift a *maximum* of twenty pounds at a time. ECF No. 17 at 49; ECF No. 17-1 at 300. Although Hartford was required to give serious consideration to the statements submitted by Dr. Singh and the subjective complaints voiced by Minutello, it was not required to credit "visible fiction." *Scott v. Harris*, 550 U.S. 372, 379-381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). While the surveillance videos were not alone sufficient to establish Minutello's ability to work on a full-time basis, they undoubtedly provided Hartford with a reasonable basis for concluding that the extreme limitations described by Dr. Singh and Minutello were lacking in evidentiary support. *Vlass*, 244 F.3d at 31-32.

Minutello posits that Hartford acted unreasonably in relying on Aaron's functional capacity evaluation as a basis for denying her appeal. ECF No. 22 at 15. In support of her position, Minutello relies on *Stup v. UNUM Life Insurance Co.*, 390 F.3d 301 (4th Cir. 2004). *Id.* In *Stup*, the United States Court of Appeals for the Fourth Circuit held that a plan administrator had abused its discretion by denying a claim based on the results of a functional capacity evaluation lasting for only two-and-a-half hours. *Stup*, 390 F.3d at 309-310. The facts in *Stup*, however, were meaningfully different from the facts in this case. The claimant in *Stup* had been unable to complete the evaluation because of pain, leaving the physical therapist conducting the test with the impression that the results of the evaluation were not "truly indicative" of the

claimant's functional capabilities.  *Id.* at 304.  In light of the physical therapist's "equivocal and tentative interpretation" of the test results, the Court of Appeals concluded that they were not indicative of the claimant's ability to work.  *Id.* at 309-310.  The instant case is different in that Aaron found the results of his evaluation to be an accurate reflection of Minutello's *minimum* abilities, suggesting that her *maximum* abilities could not be ascertained from the test results. ECF No. 17-1 at 252.  Since Aaron unequivocally opined that Minutello was capable of performing "light" work, the reasoning employed in *Stup* does not undermine Hartford's termination decision.  *Id.*

A plan administrator's failure to procure an independent medical examination or a functional capacity evaluation before denying a claim or discontinuing a claimant's benefits may "raise questions about the thoroughness and accuracy of the benefits determination."  *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  If Hartford had made its termination decision without asking Minutello to undergo a physical examination or a functional capacity evaluation, its failure to "objectively measure her physical abilities" would have constituted a ground for setting that decision aside.  *Lamanna v. Special Agents Mutual Benefits Association*, 546 F.Supp.2d 261, 296 (W.D.Pa. 2008).  In this case, Hartford based its initial decision on the surveillance videos created by the SIU, Fitzgerald's observations of Minutello during a face-to-face interview, and the results of Dr. Richless' independent medical examination.  ECF No. 17-1 at 121-122.  When Minutello appealed that decision, she sent a copy of Dr. Singh's assessment to the Claim Appeal Unit.  ECF No. 17-1 at 294-302.  The documentary record confirms that the functional capacity evaluation was conducted in order to resolve the inconsistency between Dr. Singh's opinion and the other evidence available to Hartford.  A notation entered by Guthrie on November 11, 2011, recorded the following observations:

> Appeal Specialist notes that while Dr. Singh provides extremely strict limitations and restrictions, the IME report by Dr. Richless recommended no restrictions or limitations. Given that claimant does have documented lupus and ongoing self-reported complaints, it is very likely that her functionality is somewhere between the assessments of Dr. Singh and Dr. Richless. Appeal Specialist also notes that while the surveillance clearly documents greater functionality than that reported by the claimant, it is not clear that claimant would have the capacity to sustain that level of activity on a full-time basis given the minimal amount of time she was observed out of the home over 4 days. It is also unclear whether claimant has the capacity for Light level work. Will arrange for her to undergo an FCE.

*Id.* at 8. Aaron later determined that, at a *minimum*, Minutello could engage in "light" work activities. *Id.* at 252. The results of the functional capacity evaluation ultimately led Hartford to uphold its earlier termination decision. *Id.* The thoroughness of Hartford's review procedure weighs in favor, rather than against, its position in this case. *Elliott v. Metropolitan Life Insurance Co.*, 473 F.3d 613, 621 (6th Cir. 2006).

The record indicates that Hartford made its decision on the basis of the evidentiary record as a whole. *Eppley*, 789 F.Supp.2d at 573-574. Hartford was not required to "accord special deference" to the opinions expressed by Dr. Singh. *Nord*, 538 U.S. at 825. Minutello cannot impugn the ultimate termination decision simply by asserting that each piece of evidence relied upon by Hartford, when viewed in isolation, was not sufficiently probative to outweigh Dr. Singh's assessment. The Court is not free to substitute its own view of the evidence for Hartford's factual findings. *Orvosh v. Program of Group Insurance*, 222 F.3d 123, 129 (3d Cir. 2000).

Although physicians are qualified to determine whether an individual is capable of performing certain work-related tasks, they often lack the vocational expertise needed to determine whether certain functional limitations would preclude him or her from maintaining a specific job. *Willis v. Baxter International, Inc.*, 175 F.Supp.2d 819, 832 (W.D.N.C. 2001). For

this reason, a plan administrator may need to consult a vocational expert before deciding whether jobs consistent with a claimant's abilities and limitations are readily available.[6] *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 (8th Cir. 1989). Hartford fulfilled this obligation by procuring Bryant's vocational assessment. ECF No. 17-1 at 383-396.

Minutello asserts that Bryant's assessment failed to account for the impact that her pain had on her ability to work. ECF No. 32 at 8. This argument blurs the distinction between medical evidence and vocational evidence. Bryant's vocational analysis was based on the findings of Dr. Richless' examination. ECF No. 17-1 at 383. The positions identified by Bryant were classified as "light" jobs. *Id.* at 394-396. Aaron later concluded that Minutello could perform the duties of a "light" job. *Id.* at 251-261. In her letter to Minutello's counsel, Guthrie pointed out that the functional capacity identified by Aaron was consistent with the jobs described in Bryant's vocational assessment. *Id.* at 110. Since no disconnect existed between Hartford's medical and vocational findings, its reliance on Bryant's assessment did not constitute an abuse of discretion. *Tesche v. Continental Casualty Co.*, 109 Fed.Appx. 495, 496-498 (3d Cir. 2004)(unpublished).

D.    The Relevance of Minutello's "Disability" Under the Social Security Act

In connection with her participation in the Plan, Minutello was required to apply for benefits under the Social Security Act. ECF No. 17-2 at 16. The SSA concluded that Minutello had become statutorily "disabled" on June 1, 2001. ECF No. 17-1 at 1093. Minutello argues

---

[6] It is not clear whether Hartford was *required* to procure a vocational analysis in this case. *Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 249-251 (5th Cir. 2009)(finding no need for vocational evidence where the plan in question only required the plan administrator to "ensure that the applicant [wa]s capable of performing any occupation or employment for which he [wa]s qualified by his education, training, or experience"). Since Hartford obtained Bryant's assessment, there is no need for the Court to consider whether the termination decision would have been permissible without that assessment.

that Hartford abused its discretion by terminating her long-term disability benefits despite her continued receipt of Social Security disability benefits.[7]  ECF No. 22 at 15-16.

Legislative bodies and plan administrators are free to define specific terms as they see fit. *Lopez v. Gonzalez*, 549 U.S. 47, 54, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006).  The fact that someone is "disabled" for one purpose does not inevitably mean that he or she is "disabled" for all purposes.  *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 801-807, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999).  In certain instances, however, an award of benefits under the Social Security Act can weigh in favor of a finding that the recipient is also entitled to benefits under a plan governed by the ERISA.  *Glenn*, 554 U.S. at 118.  Where a plan definition closely resembles the Social Security Act's definition of the term "disability," a determination made by the SSA may carry significant weight.  *Hines v. Unum Life Insurance Co.*, 110 F.Supp.2d 458, 468 (W.D.Va. 2000).

A person is "disabled" within the meaning of the Social Security Act if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[8]  42 U.S.C. § 1382c(a)(3).  In order to qualify for Social Security disability benefits, a claimant must not only be "unable to do his [or her] previous work," but must also be unable to "engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The SSA awarded benefits to Minutello on February 17, 2002.

---

[7] The documentary record indicates that Minutello was still receiving benefits under the Social Security Act when Hartford terminated her long-term disability benefits under the Plan.  ECF No. 17-1 at 123.
[8] This definition appears in Title XVI of the Social Security Act [42 U.S.C. §§ 1381-1383f], which governs the provision of supplemental security income benefits.  Title II of the Social Security Act [42 U.S.C. §§ 401-433], which governs the provision of disability insurance benefits, defines the term "disability" in a way that mirrors Title XVI's language describing an individual as "disabled."  42 U.S.C. § 423(d)(1)(A).

ECF No. 17-1 at 1093.  The award was based on a determination that she had become "disabled" on June 1, 2001.  *Id.*

Minutello initially received long-term disability benefits under the Plan because of her inability to continue performing the duties of her own position.  ECF No. 17-1 at 862-863.  In order to receive benefits beyond June 2, 2003, she needed to show that she could not perform the duties of "an[y] occupation for which [she was] qualified by education, training or experience."[9] ECF No. 17-2 at 24.  Hartford ultimately concluded that Minutello was "disabled" under this more demanding standard.  ECF Nos. 20 & 32 at ¶ 12.  Minutello's long-term disability benefits continued until July 25, 2011, when Hartford determined that she was no longer "disabled."  ECF No. 17-1 at 122.

The disability standard used by the Plan for the period of time postdating June 2, 2003, resembles the standard applicable to claims brought under the Social Security Act.  *Barnhart v. Thomas*, 540 U.S. 20, 25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(explaining that the SSA considers a claimant's "age, education, and past work experience" in order to determine whether he or she "is capable of performing other jobs existing in significant numbers in the national economy").  In order to secure Social Security disability benefits, however, Minutello did not have to establish that she would be unable to work for the rest of her life.  Instead, she only needed to demonstrate that her impairments were likely to prevent her from working for the statutory twelve-month period.  *Barnhart v. Thomas*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).  The SSA's decision awarding benefits to Minutello constituted a determination that she would not be able to work before June 1, 2002.  ECF No. 17-1 at 1093.  It did not constitute a projection that she would remain disabled beyond July 25, 2011.

---

[9] The Plan's definition of the term "Any Occupation" also requires the relevant position to have an "earnings potential" determined in accordance with a specified formula.  ECF No. 17-2 at 24.

In order to terminate Minutello's benefits under the Social Security Act, the SSA would need to proceed in accordance with a detailed protocol. *Hagans v. Commissioner of Social Security*, 694 F.3d 287, 307-308 (3d Cir. 2012). Unlike the SSA, Hartford was not required to measure Minutello's condition "against a uniform set of federal criteria." *Nord*, 538 U.S. at 833. Under regulations promulgated by the Commissioner of Social Security, an assessment submitted by a treating physician is entitled to more weight than an opinion expressed by a consultative examiner. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). That rule does not control the discretion of plan administrators. *Nord*, 538 U.S. at 830-834. Furthermore, Hartford's termination decision was based almost exclusively on evidence that was not available when the SSA awarded Minutello benefits under the Social Security Act. ECF Nos. 20 & 32 at ¶¶ 25-39, 42-49, 66-69. Under these circumstances, the SSA's earlier determination had little relevance to Minutello's continued eligibility for benefits under the Plan. *Hobson v. Metropolitan Life Insurance Co.*, 574 F.3d 75, 91-92 (2d Cir. 2009).

IV.     **Conclusion**

In enacting the ERISA, Congress sought to alleviate disputes between competing interests. *Renfro v. Unisys Corp.*, 671 F.3d 314, 321 (3d Cir. 2011). Although the ERISA strives to "offer employees enhanced protection for their benefits," it does not "create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The ERISA must be interpreted and applied "in light of its objectives of ensuring the enforcement of employees' rights under existing employee benefit plans and encouraging employers to create additional employee benefit plans." *Haisley*, 776 F.Supp.2d at 43. The relevant policy language unambiguously provides Hartford with "full

discretion and authority to determine eligibility for benefits" under the Plan. ECF No. 17-2 at 17. A decision setting aside Hartford's determination concerning Minutello's eligibility "might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). By deferring to Hartford's eminently reasonable decision in this case, the Court preserves the incentive that Starwood has to offer its employees the benefits that Minutello enjoyed for a decade. *Conkright*, 130 S.Ct. at 1648-1649.

In this context, the Court has no authority to substitute its own judgment for that of Hartford. *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D.Pa. 1984). No opinion is expressed as to whether Hartford *correctly* ascertained Minutello's functional abilities and limitations. Since Hartford's factual findings are "reasonable," they cannot be disturbed. *Firestone*, 489 U.S. at 111. The motion for summary judgment filed by Hartford (*ECF No. 18*) will be granted, and the motion for summary judgment filed by Minutello (*ECF No. 23*) will be denied. An appropriate order follows.

McVerry, J.


cc:     All counsel of record

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THERESA R. MINUTELLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:12-cv-01240** |
| | ) | |
| **HARTFORD LIFE AND ACCIDENT** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

AND NOW, this 12th day of August, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the Defendant's Motion for Summary Judgment (*ECF No. 18*) is **GRANTED**, and that the Plaintiff's Motion for Summary Judgment (*ECF No. 23*) is **DENIED**.  The Clerk is directed to docket this case as closed.

BY THE COURT:


s/ Terrence F. McVerry
Terrence F. McVerry
United States District Judge


cc:    All counsel of record